## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

KELLI TAYLOR,            )
               Plaintiff,    )
                         )
v.                         )   Case No. 23-2287-JWB-ADM
                         )
GRAY MEDIA GROUP, INC.,   )
              Defendant.   )
                         )

### <u>PRETRIAL ORDER</u>

On August 13 and October 4, 2024, U.S. Magistrate Judge Angel D. Mitchell conducted a pretrial conference in this case, by phone. Plaintiff Kelli Taylor ("Taylor") appeared through counsel Cooper Mach. Defendant Gray Media Group, Inc.[1] ("Gray") appeared through counsel Trina R. Ricketts and Kelly Hayes.

This pretrial order supersedes all pleadings and controls the subsequent course of this case. It will not be modified except by consent of the parties and the court's approval, or by order of the court to prevent manifest injustice. *See* Fed. R. Civ. P. 16(d) & (e); D. Kan. Rule 16.2(a).

1. **PRELIMINARY MATTERS.**

    a.    **Subject-Matter Jurisdiction.** Subject-matter jurisdiction is invoked under 28 U.S.C. § 1332 and is not disputed.

    b.    **Personal Jurisdiction.** The court's personal jurisdiction over the parties is not disputed.

    c.    **Venue.** Venue in this court is not disputed.

    d.    **Governing Law.** Subject to the court's determination of the law that applies to the case, the parties believe and agree that the substantive issues in this case are governed by 42 U.S.C. § 1981 ("§ 1981"); Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.* ("Title VII");

---

[1]   Effective July 1, 2024, Gray Media Group, Inc. became Gray Local Media, Inc.

the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"); and the Family and

Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA").  The parties agree that Kansas law

governs Gray's counterclaim.

**2.    STIPULATIONS.**

    **a.**    The following facts are stipulated:

        **i.**    Gray is based out of Atlanta, Georgia.  It owns and operates television stations and digital properties in 113 television markets across the United States.

        **ii.**    Gray's television stations cover approximately 36 percent of U.S. television households and broadcast approximately 400 separate programming streams, including KCTV5 in Kansas City, Missouri.

        **iii.**    On March 14, 2017, Taylor received an offer letter from the Meredith Corporation ("Meredith") as a Newsperson Multi-Media Journalist ("Newsperson MMJ").

        **iv.**    Taylor is an African-American female.

        **v.**    On or around April 26, 2017, Taylor executed her first Employment Agreement with Meredith for the role Newsperson MMJ, with a term from April 26, 2017, to April 25, 2019.

        **vi.**    Taylor extended that agreement two more times—in April 2019 and in October 2019.

        **vii.**    On or around June 26, 2020, Taylor executed an Employment Agreement with Meredith for the role Newsperson MMJ with a term from June 26, 2020, to June 25, 2023.

        **viii.**    On or around September 7, 2020, Taylor entered into her most recent Employment Agreement with Meredith for the role of Newscaster (sometimes referred to as "the Role" or "THE ROLE") with KCTV5 in Kansas City, with a term from September 7, 2020, to September 6, 2023 (the "September 2020 Employment Agreement").

        **ix.**    The September 2020 Employment Agreement states as follows: "Employee will be employed by the Employer to fulfill the Role.  As such Employee shall ensure his/her availability to perform the duties of the Role, or such other duties as may be assigned by the News Director, General Manager or Employer designee. Without limiting the foregoing, Employee's duties may include (in any media now

known or thereafter developed): appearance on any media, hosting of programs, writing, editing and producing scripts, news stories and newscast, announcing, recording announcements, news gathering in the studio and in the field, other field work, news, research, rewriting stories and scripts, field reporting, live appearances (including community events), photography, participation in meetings, and any other duties which may be assigned by the Employer from time to time. Employee may be assigned to work any shift, shifts, or split-shifts."

x. "Exhibit A – THE ROLE" to the September 2020 Employment Agreement defines Taylor's Role as "Newscaster" as requiring "appearances on the air or in any media, writing, editing and producing scripts, news stories and newscasts, announcing, recording announcements, newsgathering in the studio and in the field work, news research, rewriting stories and scripts, field reporting and live appearances."

xi. The "Term" of employment in the September 2020 Employment Agreement began on September 7, 2020, with an end date of September 6, 2023.

xii. On December 1, 2021, Meredith was acquired and merged with Gray Hawkeye Solutions, Inc., with Meredith being the surviving entity that was renamed Hawkeye Acquisitions, Inc.

xiii. On or around December 21, 2021, Taylor texted Allison Rodriguez inquiring about a potential employment opportunity at a station in Arizona.

xiv. On December 31, 2021, Hawkeye Acquisitions, Inc. merged into Gray Media Group, Inc. with Gray being the surviving entity.

xv. When Gray acquired Meredith and KCTV5, all terms and conditions of the September 7, 2020 Employment Agreement were transferred to Gray.

xvi. On or around February 4, 2022, former News Director Karin Movesian ("Movesian") told Taylor that she needed to report in the field two days a week due to Carolina Cruz ("Cruz") being promoted to evening anchor with another co-worker being moved to cover Cruz's previous shift. This change required Taylor to begin her shift an hour earlier than what she had been working at the time.

xvii. On February 7, 2022, Catherine (Kate) Glover ("Glover") started as the News Director at KCTV5.

xviii.      Shortly after Glover arrived at KCTV5, Glover told Taylor that she would be reporting in the field five days a week instead of sitting at the Alert Desk, as part of her duties as a Newscaster.

xix.       Glover also told Taylor that Taylor would continue to anchor the noon news (in addition to field reporting in the morning) as part of her duties as a Newscaster.

xx.        On February 9, 2022, Taylor emailed Gray TV–Benefits, asking to speak with someone about a leave request.  Benefits Specialist Leslie Spear ("Spear") responded, seeking more information about the type of leave Taylor was seeking (whether it was personal, medical, or health related, etc.).

xxi.       The same day, Spear told Taylor that the type of leave would depend on whether it was health-related or not, but that Lincoln Financial Group ("LFG") would provide Taylor with the appropriate forms.

xxii.      On February 14, 2022, Taylor applied for a job with Johnson County, Kansas.

xxiii.     On February 16, 2022, Taylor contacted LFG to apply for Family Medical Leave Act ("FMLA") leave and Short-Term Disability ("STD") with an anticipated leave start date of February 19, 2022.

xxiv.      This same day, LFG sent Taylor a letter of acknowledgement for Claims 12498954 and 12498955 with an initial leave date of February 19, 2022.  LFG told her that she had until March 6, 2022, to submit medical certification of her disability.

xxv.       LFG also told Taylor that if her STD was not approved within fifteen days after February 19, 2022, she would have the ability to certify her leave under FMLA only.

xxvi.      On February 19, 2022, LFG tried to contact Taylor to conduct an interview for the requested FMLA and STD claims.

xxvii.     On February 25, 2022, Taylor called LFG to change her leave start date from February 19 to March 5, 2022, making the new required notification date for medical certification March 21, 2022.

xxviii.    On February 25, 2022, Joe Chiodo ("Chiodo") told Gray of his resignation effective March 29, 2022, due to pursuing a career outside newscasting.  Glover announced to the newsroom that Chiodo would be leaving KCTV5.

xxix.    On February 25, 2022, Taylor texted with Chiodo discussing that she would be taking a Leave of Absence.

xxx.    On February 23, 2022, Glover sent an email to Carolyn Kane, a talent representative, stating "looking for a male morning anchor."

xxxi.    The vacant position was to be filled at the discretion of Glover and Station General Manager Andrew Stewart ("Stewart").

xxxii.    On February 28, 2022, Gray posted the open job position of News Anchor/Reporter (morning) for KCTV5. The job posting said the position was to be filled in compliance with Equal Employment Opportunity law.

xxxiii.    On March 1, 2022, Office Manager Larry Eighme ("Eighme") signed a Notice of Leave/Return, stating Taylor's effective leave date was March 7, 2022.

xxxiv.    Taylor's leave began on March 7, 2022.

xxxv.    On March 15, 2022, Johnson County emailed Taylor offering her the position of Communication Specialist with an anticipated start date of April 11, 2022.

xxxvi.    On March 16, 2022, LFG contacted Taylor's healthcare providers to request medical documentation to support Taylor's STD claim. LFG sent a corresponding letter to Taylor informing her that the deadline to get her STD claim approved was April 29, 2022.

xxxvii.    Chiodo's last day with KCTV5 was March 29, 2022, while Taylor was still on leave.

xxxviii.    On April 4, 2022, Taylor returned to work from her leave of absence.

xxxix.    Taylor worked a couple of hours that morning, then gave her voluntary resignation letter to Stewart.

xl.    In connection with Taylor's resignation discussion with Stewart, she expressed some general concerns about hostile work environment and that Glover had shared Taylor's personal medical information with several co-workers.

xli.    On April 11, 2022, Taylor started her new job as a Communication Specialist with Johnson County.

xlii.    On May 16, 2022, LFG informed Taylor that her claims were denied because of her resignation and the medical evidence did not support

mental or physical functional impairment. Taylor never timely submitted the proper documentation for approved FMLA Leave. Taylor was given all leave requested.

xliii.    On May 20, 2022, Gray sent a letter to Taylor concerning her breach of the September 2020 Employment Agreement and requesting $10,000 in Liquidated Damages.

b.    The parties have stipulated to the authenticity of the following exhibits for purposes of summary judgment:

i.    Taylor's three Employment Agreements:

1.    April 26, 2017 – APRIL 25, 2019 Agreement (GRAY TAYLOR 000021 – GRAY TAYLOR 000035)

- April 26, 2019 Amendment to the April 26, 2017 Agreement (GRAY TAYLOR 000018)

- October 26, 2019 2ND Amendment to the April 26, 2017 Agreement (GRAY TAYLOR 000019)

2.    June 26, 2020 - June 25, 2023 Agreement (GRAY TAYLOR 000003 – GRAY TAYLOR 000017)

3.    September 7, 2020 - September 6, 2023 – Employment Agreement (GRAY TAYLOR 002330 – GRAY TAYLOR 002344)

ii.    Collective Bargaining Agreements during Taylor's Employment:

1.    Agreement between SAG-AFTRA Missouri Valley Local and Meredith Corp., Local Media Group, KCTV effective May 1, 2016 – April 2018 (GRAY TAYLOR 002398 – GRAY TAYLOR 002455)

2.    December 4, 2017 - Agreement between SAG-AFTRA Missouri Valley Local and Meredith Corp., Local Media Group, KCTV effective January 1, 2018 – December 31, 2019 (GRAY TAYLOR 002456 – GRAY TAYLOR 002516)

3.    May 4, 2020 Agreement between SAG-AFTRA Missouri Valley Local and Meredith Corp., Local Media Group, KCTV effective January 1, 2020 – December 31, 2021 (GRAY TAYLOR 000066 – GRAY TAYLOR 000129)

4.    September 15, 2022 Agreement between SAG-AFTRA Missouri Valley Local and Gray Media Group, Inc., KCTV effective

January 1, 2022 – December 31, 2023 (GRAY TAYLOR 002159 – GRAY TAYLOR 002224)

5.    November 28, 2023 Agreement between SAG-AFTRA Missouri Valley Local and Gray Media Group, Inc., KCTV effective January 1, 2024 – December 31, 2026 (GRAY TAYLOR 002225 – GRAY TAYLOR 002288)

iii.    Gray's Employee Handbook: January 15, 2019 Handbook (GRAY TAYLOR 002345 – GRAY TAYLOR 002397)

iv.    Emails and text messages produced by the parties, excluding Dep. Ex. 32

v.    Documents/business records maintained by Gray regarding Taylor's employment pay, paid time off, vacation, leave requests and leave

vi.    Lincoln Financial Group business records/documents related to Taylor and/or her request for leave

vii.    Third party business records received through subpoenas

viii.    Documents produced by Taylor regarding her search for, applications for, offers, and acceptance of other employment while employed by Gray and after her resignation from Gray

ix.    Pay, benefits, and tax records produced by Taylor for work after her resignation from Gray

x.    Dep. Ex. 21

xi.    Dep. Ex. 22

xii.    Dep. Ex. 30

xiii.    Dep. Ex. 57

xiv.    Dep. Ex. 59

xv.    Dep. Ex. 60

xvi.    Dep. Ex. 63

xvii.    Dep. Ex. 64

xviii.    Dep. Ex. 65

xix.    Dep. Ex. 83

xx.    Dep. Ex. 85

| | |
|---|---|
| **xxi.** | Dep. Ex. 93 |
| **xxii.** | Dep. Ex. 103 |
| **xxiii.** | Dep. Ex. 104 |
| **xxiv.** | Dep. Ex. 105 |
| **xxv.** | Dep. Ex. 110 |
| **xxvi.** | Dep. Ex. 112 |
| **xxvii.** | Dep. Ex. 113 |
| **xxviii.** | Dep. Ex. 114 |
| **xxix.** | Dep. Ex. 115 |

**3.    FACTUAL CONTENTIONS.**

    **a.    Plaintiff Taylor's Factual Contentions.**

In 2017, Taylor began her employment in the Kansas City news market with Meredith as a Newsperson MMJ at KCTV5. When Gray purchased the KCTV5 studio from Meredith in December 2021, Taylor was working in the studio on almost every morning newscast as a "third anchor," anchoring from the Live Desk. Taylor occasionally reported in the field, but primarily worked in studio, as did the other anchors, Chiodo and Gina Bullard ("Bullard"). When Bullard or Chiodo were sick or absent, Taylor was the primary individual that filled in at the anchor desk.

As part of Gray's purchase of the studio, Gray began inserting its employees from other studios at KCTV5. In December 2021, Gray moved Stewart, a white male, to Kansas City to become the station's General Manager. On February 7, 2022, Gray placed Glover, a white female, as News Director. Stewart and Glover are the two primary decision makers when it comes to personnel decisions for on-air talent at the studio level. The anchors for the morning show were white male Chiodo and white female Bullard. The only on-air African American on the morning show besides Taylor was a field reporter.

On January 25, 2022, Taylor raised a concern with local HR member Monica Ngo about a recent hiring decision promoting certain internal candidates to anchor without an opportunity for her to apply. She also had a conversation with Stewart, who was aware of Taylor's desire to move up to the anchor position.

### Glover begins picking on Taylor

Almost immediately after Glover began, she demoted Taylor from "third anchor" in studio to a field reporter multiple days. This required Taylor to report to sites at 3:30 a.m. rather than 4:30 a.m. As a single mother, this created childcare issues for Taylor, and she relayed this to Glover. The earlier call time also unnecessarily added to the number of hours Taylor was required to work because Gray still required her to stay through the noon telecast. Taylor asked that, rather than going live at 5:00 a.m., she go live for the 6:00 a.m. broadcast, which would have allowed her to have the same call time of 4:30 a.m. that she had before Glover forced her into the field. Neither Bullard nor Chiodo were asked to report from the field regularly as Taylor was.

Two weeks after Glover started, she called Taylor into her office. Glover told Taylor that, since Taylor had called in sick earlier, her previously approved vacation for the end of the month was not going to be honored. Only after Taylor brought in Union representation did Glover back down and acknowledge that she could not take away pre-approved vacation time.

### Taylor's disability and request for leave

On January 5, 2022, Taylor visited her primary care physician due to symptoms of increased stress and anxiety since Gray took over at KCTV5. Her physician diagnosed her with Shift Work Sleep Disorder. Taylor began seeing her therapist to discuss and treat her disorder. After attempting to push through and after being exposed to Glover's poor treatment, Taylor's therapist recommended that she take a leave of absence to regulate her sleep and anxiety.

On February 9, 2022, Taylor emailed Gray TV–Benefits, asking about how to file a request for leave of absence. Taylor filled out the necessary paperwork and alerted the required personnel in Kansas City of her intention to take the leave of absence. Taylor applied for FMLA leave and/or STD through third-party LFG. After discussions with LFG, Gray's Benefits group, and necessary individuals at the KCTV5 studio, Taylor began her leave of absence after the newscast on March 4, 2022. During that newscast, Taylor solo-anchored breaking news coverage of the shooting that occurred at Olathe East High School, coverage that garnered the praise of management at KCTV5. Gray acknowledges that Taylor was entitled to take leave beginning after her March 4 shift.

Before Taylor's leave began, Glover and Stewart had begun discussing replacing her. In an email exchange, Glover sent Stewart a reporter's resume reel and stated, "we should hire her in here either as a weekend anchor or third in the morning anchor/live desk/OTT desk, if Kelli goes." At that point in time, Gray was on notice of Taylor's upcoming leave, and the decisionmakers were talking about replacing her instead of talking about her returning to work.

Although Taylor's leave was still pending with LFG, Gray was obligated to treat the leave as if it were approved FMLA leave. As part of Gray's policy, any PTO due to an employee is automatically applied to pay the employee while the employee is on FMLA leave. While on leave, Taylor realized that she had not been paid for all the hours she had worked. Although the proper payouts should have been taken care of at the managerial level, Taylor was forced to bring up the issue with payroll. Gray also did not initially give Taylor an additional 10 hours of PTO to which she was entitled and should have been paid under Gray policy. Only after Taylor brought up her concerns did Gray correct the issues. She received her proper pay weeks later than expected.

The day after Taylor raised her concerns, local payroll HR representative Eighme sent a copy of Taylor's contract to regional HR member Laurel Berenguer ("Berenguer"), cc'ing Stewart

and Glover.  Berenguer responded to all, stating, "I assume we have no 'paper' on this employee." All parties responded that they did not have any "paper" on Taylor.  This cryptic search for "paper" on Taylor while she was out on leave is evidence of Gray looking for an excuse to "paper her file" in order to terminate her.  The follow-up emails say they were planning to look through Taylor's emails and get IT involved to find any "paper."

Also, while Taylor was on leave, Assistant News Director Aurora Nelson ("Nelson") sent a copy of a picture posted on Taylor's personal Instagram account showing she had been in Cancun for her birthday while on leave.  But nothing about Taylor traveling to Mexico for a relaxing vacation with her family was against doctor's recommendations because her leave was for Shiftwork Sleep Disorder.  No witness was able to recall any similar situation where a personal photo was shared with station management of an individual who was on leave.

An early April 2022 email exchange between Eighme and Berenguer further evidences Glover's resentment of Taylor's leave.  They were discussing different individuals' leaves of absence when Berenguer stated, "Kate [Glover] and the team seem to think we're being overly generous/lenient" about employee leaves of absence.  Eighme responded that he's "guessing it is Edwin, Brett and Kelli that are the real issues."  Glover clearly discussed a bias against Taylor taking her approved leave of absence with HR personnel.

**Upon Taylor's return from leave, Gray failed to return her to the same or similar job**

While Taylor was on leave, she was offered a position outside news media with the Government of Johnson County.  While Taylor was considering this career change, she decided to continue pursuing her dream of being a news anchor.  She decided to give KCTV5 another shot at making things right by her.  On March 15, 2022, Taylor was texting Chiodo about the atmosphere at KCTV5 and mentioned that she was going to decline the Johnson County job to continue

pursuing her career in news broadcasting.  Taylor's month-long leave of absence was set to conclude with her returning to the studio on April 4, 2022.  On April 1, 2022, Nelson told Taylor that, upon her return, she would be "reporting in the am and anchoring the noon."  Taylor responded that she was looking forward to coming back but mentioned that the return to reporting in the a.m. was discussed before knowing Chiodo was no longer going to be at the studio— questioning why she was not given the chance to fill his vacant chair.  Taylor responded to Nelson in an email that included Glover.  In the email, Taylor asked for some context on the decision to have Morgan Mobley ("Mobley"), a white female, be the temporary morning anchor, when Taylor had been the primary fill-in anchor before she went on leave.  Glover responded that "we made the decision that Morgan will fill in on the anchoring role until a permanent replacement for Joe is named."  Taylor responded again, asking for more of an explanation rather than just a statement as to the decision being made.  When Glover escalated this to Stewart, he told Glover, "We don't need to explain your decisions to her."  Gray demoted Taylor to full-time field reporter when it should have returned her to the position of temporary anchor as she had been occupying the fill-in position prior to leave, had more seniority at the studio than Mobley, and had more anchoring experience.  Despite Mobley being given the opportunity to fill the seat, she never expressed interest in the position or applied for the vacancy.

Taylor appeared and worked the beginning of her shift the morning of April 4, 2022.  However, once she realized she had hit the glass ceiling and the studio was totally closed off from giving her a shot at Chiodo's anchor role, she decided there was no opportunity for her to continue at KCTV5.  Taylor heard that Glover had told co-workers that Taylor would never anchor for the studio again.  Taylor then asked for a meeting with Stewart, where she handed him a typed letter that she was resigning her employment.  In this meeting, Taylor told Stewart that she was resigning

because Glover had created a hostile work environment, had discussed Taylor's personal medical information with co-workers, had made the comment that Taylor would never anchor here again, and had created a toxic work environment. Stewart did not escalate any of these claims to HR, and Gray never investigated the allegations. Rather, Stewart called Glover into the office, bringing the alleged harasser in as a "witness" to the "resignation." When Taylor tried to further explain, Stewart stated, "we're done here" and cut the meeting short.

### Taylor never had a shot at filling Chiodo's seat because the process was littered with EEO violations and discriminatory motives

Morning news anchor Chiodo told Gray about his desire to leave the industry in February 2022, even though he was under contract for at least another eight months. Stewart was aware of Taylor's desire to move up to anchor as of January 25, 2022. Gray gives hiring power to local station management, so Stewart and Glover had discretion to determine who to hire as Chiodo's replacement. Gray's policies mirror federal EEO law and state that Gray will make "all employment decision . . . without regard to" protected classes including race, gender, and disability. The decision to hire Chiodo's replacement was an employment decision subject to both Gray policy and federal EEO and ADA law that was to be effectuated on behalf of Gray based on Stewart and Glover's views, biases, and opinions of candidates. The job was posted on February 28, 2022, with a disclaimer that "Gray Television provides equal employment opportunities (EEO) to all employees and applicants for employment without regard to race, color, religion, sex."

But then Glover emailed Kane on February 23, 2022, stating she was "looking for a male morning anchor here at KCTV in Kansas City." As an individual with hiring power, Glover effectively eliminated Taylor from contention for the position at this moment. The ensuing email chain confirms that Glover was only interested in finding a male candidate to replace Chiodo.

Taylor made her interest in an anchor position known to local HR (Monica Ngo) and Stewart as of January 25, 2022. She further made her interest known in her April 1, 2022, email where she questioned why she was not chosen as the temporary fill in for Chiodo's seat upon her return. There is no formal application process for an internal promotion like the one Taylor sought. Gray admits that a candidate is qualified to be considered for the position by showing interest to the hiring manager.

On March 8, 2022, Glover again made clear that Gray was looking for a male anchor, which eliminated Taylor from consideration. In a "Weekly Note-News" email to Stewart, Glover said that "Good options for a new male anchor in the morning are starting to come in." Aaron Baker, a white male, was brought in to test read with Bullard. At the time, Taylor still worked for Gray.

In a May 11, 2022, email to Regional Vice President Mike King, Stewart stated that, "I would really like to find a Black [sic] male to give us some more diversity in the morning." Stewart believes that the Federal Communication Commission actually expects and encourages television stations to consider the race and gender of on-air talent to reflect the makeup of the market the station serves. Stewart held these same beliefs at the time Taylor was employed by Gray and was expressing interest in the vacant anchor position.

While Gray was still trying to fill the anchor chair, Glover sent an email in July 2022 to all of Gray's news directors across the country. The email stated that she was "having a heck of a time finding an African American male to be our next morning anchor, here in Kansas City." A few days later, Glover received an email "disciplining" her for sending an email that "could be viewed as discriminatory." This was the extent of the discipline. Gray did not initiate any

investigations or take any action regarding Glover or Stewart's previous emails in which they mentioned searching for a specific race or gender to fill Chiodo's vacant position.

After months of fruitless searching for a black male to fill the position, Gray decided to offer the position to internal candidate Cruz, a Latina female. This was made official in October 2022. Cruz was not considered for the position initially, but was given the opportunity to be the "temporary" fill in for Chiodo's seat while Glover and Stewart pursued a black male for the permanent position. Cruz was given the temporary position only after Mobley decided she did not want the temporary anchor seat. Cruz remained temporary for over five months before Glover decided to give her the position full-time. While Cruz was in the temporary position, both Stewart and Glover authored emails admitting they were searching for a black male.

Since Gray took over the KCTV5 studio, there have been a total of 48 on-air personalities at the studio. Of that number, only eight have been African American, only two of those have been hired by Gray rather than its predecessor, and four out of the eight have left the studio.

**Gray attempts to collect liquidated damages although it already breached the agreement**

The September 2020 Employment Agreement states that it creates obligations on both the employee (Taylor) and the employer (Gray). Paragraph 4 states that, "Employee agrees to accept and follow all rules, regulations, and policies adopted or modified by Employer from time to time." As the employer, Gray is equally bound by the statement and promises to follow its own rules, regulations, and policies. Further, Gray agrees that the contract incorporates by reference the Collective Bargaining Agreement ("CBA") between itself and the SAG-AFTRA Missouri Valley Local Union, of which Taylor was a member. Both Gray's Employee Handbook and the CBA have provisions providing EEO protection for employees in all employment decisions made by the employer. This includes Handbook provisions stating that all decisions will be made "without

regard" to protected classes, and CBA provisions where the Employer and Union agree that "they will not discriminate against the Employee or applicant because of" protected classes.

Gray posted the open position for Chiodo's replacement by at least February 28, 2022, when Taylor still worked for Gray. Gray made efforts to find Chiodo's replacement as early as February 23, 2022, and those efforts continued through October when a replacement was promoted. Taylor resigned from employment due to an alleged constructive discharge on April 4, 2022. At this time, she had already expressed interest in the position, both in her prior inquiries into promotion to anchor positions, as well as her email exchanges with Stewart and Glover on April 1, 2022, questioning why she was not considered for the position. Also while Taylor was still employed, Glover put in email correspondence multiple times that she was looking for a male candidate, eliminating Taylor from consideration. Further, the other decisionmaker, Stewart, believes there is an obligation to search for candidates of a certain race or gender. Stewart also put into emails that he was searching for a black male, which also would eliminate Taylor from contention for his consideration.

Taylor's alleged breach of the September 2020 Employment Agreement occurred on April 4, 2022, when Taylor left employment. Nothing that has occurred between that date and the present alters the material facts leading to Grays's counterclaim of breach. The fact that Taylor had applied for a position while still employed is not a concern in this case, according to Gray. In the month immediately following Taylor's end of employment, Gray attempted to collect the alleged liquidated damages from her.

Berenguer had the authority to negotiate the amount that Gray was willing to accept from Taylor. In these negotiations, Berenguer was willing to accept $3,500 paid out over 18 months. Gray also would have required Taylor to sign a release forfeiting all rights to pursue any other

remedies, including the current lawsuit. Gray's actual damages have not changed since the dates that Berenguer negotiated the attempted deal.

In contrast to Taylor, Gray agreed to let Chiodo walk away from his contract for $1,000 in liquidated damages, despite Chiodo's contract having the same $10,000 provision as Taylor's. Gray claims liquidated damages are to compensate Gray for time, energy, and resources that were already invested into the on-air personality, as well as time, energy, and resources to replace the individual and to establish a new team atmosphere. When Chiodo left, he had more time at KCTV5, a higher salary, and a more prestigious position than Taylor. Yet Gray tried to require Taylor to pay 3.5 times as much as Chiodo, even though Gray had sunk more time, money, and resources into Chiodo's career.

      **b.**    **Defendant Gray's Factual Contentions.**

The September 2020 Employment Agreement states that Taylor will remain in Gray's employment for the term of the Agreement. Paragraph 3 of the "Standard Terms and Conditions" states as follows: "The parties hereby agree that Employee's employment with Employer is for the term specified above only, subject to Section 12, below, and that Employee shall have no expectation of continued employment beyond the term of employment specified herein." Paragraph 10 states, "With respect to . . . any other breach of this Agreement, Employee agrees that . . . he/she shall pay as liquidated damages to Employer the sum of Ten Thousand ($10,000.) Dollars." Further, Paragraph 11 states, "If Employee breaches any of the terms of this Agreement then Employee shall reimburse Employer for all costs and expenses, including reasonable attorneys' fees, incurred in enforcing the terms of this Agreement, without proof of any actual damages which may have been or may be caused by such breach, and without regard to the type of relief secured. Paragraph 12 sets out specific events that would terminate the Agreement.

The September 2020 Employment Agreement dictated the terms of Taylor's employment with both Meredith and Gray.  It did not guarantee or ensure Taylor's position as a desk anchor. To the contrary, it required that she ensure her availability to perform her duties "or such other duties as may be assigned by the News Director, General Manager, or other Employee designee." It also provided that "Employee may be assigned to work any shift, shifts, or split-shifts as assigned by Employer."  When Gray acquired Meredith, the terms of the September 2020 Employment Agreement did not change, but within Gray, one of Taylor's assigned duties was as an "Alert Desk Anchor."  This entailed reporting on breaking news stories as they came into the station.  These designated duties were pursuant to the terms of the September 2022 Employment Agreement provision that "employee shall ensure his/her availability to perform the duties of the Role *or such other duties as may be assigned by the News Director, General Manager or other Employee designee."*  Taylor agreed to all terms and provisions of the September 2020 Employment Agreement by executing it.

Taylor was one of the individuals who was assigned the duties of filling in from time to time if either of the main KCTV5 morning anchors, Chiodo and Bullard, were off.  In fact, from February 7 to March 4, 2022, Taylor only anchored the regular weekday morning desk on a few occasions.  Because the "Alert Desk" reporting is optional to the broadcast, it was not run for some time in early 2022 and only returned in August 2022.  As allowed under Taylor's September 2020 Employment Agreement, she was anchoring the noon news and filled in (along with others) as requested when the main anchors were absent.

As early as 2019, Taylor began searching for other employment opportunities outside of Gray, stating that she was looking to relocate to Dallas, Texas; Palm Beach, Florida; or even Charlotte, North Carolina.  Just one week after Glover arrived at KCTV5, Taylor applied for a job

at Johnson County on February 14, 2022.  Where Taylor's application to Johnson County asked her reason for leaving KCTV5, Taylor noted she wanted a "career change."  On her application, she stated she was available to start with Johnson County on February 15, 2022.

Before Glover arrived at the station, Gray's former General Manager, Movesian, told Taylor that she would be reporting two days a week because Cruz had been moved to the evening news as anchor.  When Taylor questioned how internal "promotions are made," HR told her that, for any openings at KCTV5, employees would need to let their manager know that they were interested in the role and were welcome to apply internally to be considered.

Shortly after Glover started as the KCTV5 News Director in February 2022, Taylor approached her and asserted that the former Meredith management team promised her an anchor position. However, when Glover reviewed the terms of the September 2020 Employment Agreement, she noted that Taylor's contract did not designate her "Role" as "Anchor," so she asked Taylor to provide her with documentation that the previous Meredith management promised her an exclusive anchor position.  Taylor never provided any supporting documentation.  Other on-air talent employees who worked at Meredith (and then Gray) had employment agreements designating their "Role" as "Anchor," among other titles.

One of these individuals was Chiodo, whose vacated position Taylor claims she should have received.  Chiodo's contract designated his role as "Host, Newscaster, Anchor, Reporter" and defined his role as follows: "Appearances on the air or in any other media, hosting of programs, writing, editing, and producing scripts, news stories and newscasts, announcing, recording announcements, newsgathering in the studio and in the field, other field work, news research, rewriting stories and scripts, field reporting and live appearances."

But Taylor never operated under a contract while employed at Gray/Meredith that designated her Role as "Anchor." Instead, the September 2020 Employment Agreement designated her Role as "Newscaster."

After Taylor had applied for a job at Johnson County on February 14, 2022 (unbeknownst to Gray), at the end of February Glover asked Taylor to perform field reporting work to support the morning newscast because of a reporter shortage. Per Taylor's September 2020 Employment Agreement, Taylor agreed to perform this duty. Glover told Taylor that the agreed-to reporting work would be temporary until the station was able to hire additional reporters. Glover chose Taylor to report in the field because she was already in the studio five mornings a week and it would be the least disruptive for the morning show employees. Glover would not have to switch someone working on the weekends to weekdays and then have to find a replacement for the weekend individual. Taylor's work in the field would not change her pay or the number of hours she was scheduled, but her start time moved up 30 minutes to allow her time to travel to her live location. This change came about as Taylor stated she did not have enough time to prepare for the 5:00 a.m. broadcast, and the earlier scheduled start time allowed her sufficient preparation time. Gray's reason for assigning Taylor to report in the field was based upon a legitimate business need to have more reporters in the field and it did not change her pay or the number of hours she worked. It had nothing to do with her sex, her race, her pending FMLA claim, or any alleged disability.

Taylor responded that she could not support the team in the field because she was planning to go on leave for a month. This was the first time Glover learned about Taylor's leave. Taylor did reporting in the field once or twice before she went on leave. Prior to Taylor's leave, she worked her last shift on March 4, 2022. Gray, in an effort to accommodate Taylor's request, allowed her to begin leave on March 7, 2022, while her FMLA approval was still pending. In

Taylor's communications with LFG, she stated her condition was "work related."  Taylor ultimately failed to timely provide requested medical documentation, but Gray allowed her to take a full month leave and she returned to the same position she had prior to leave (reporting in the morning and anchoring the noon news). Taylor's leave was ultimately not deemed FMLA leave because by the time she submitted the required medical documentation she was no longer employed by Gray.  However, Gray still provided her with a leave of absence.

Before and during Taylor's leave, she applied for several jobs because she wanted a career change.  Prior to her leave of absence, on February 28, 2022, upon the announcement of Chiodo's resignation, Gray posted the News Anchor/Reporter (morning) position for Chiodo's replacement. Taylor never submitted an application for the News Anchor/Reporter (morning) position, and she did not ask Glover or any others to audition or consider her for the position.  While Taylor was on leave, Gray received, from an employee, a social media post of Taylor on vacation in Mexico. Gray was not monitoring Taylor's activities while on leave.  Gray has received from Gray employees (not through any monitoring by Gray) other similar photos/information about other employees while on leave.  Gray did not direct or request any of the information that Gray employees provided.

On April 1, 2022, near Taylor's scheduled return to work on April 4, Nelson emailed Taylor to confirm her anticipated return to work, the normal process to confirm a return from leave. Nelson stated that KCTV5 was looking forward to her return and that she would be reporting in the morning and anchoring the noon news as Glover had assigned her before her leave.  Taylor did not ask Glover or anyone else if she could apply for or read for Chiodo's position.  Instead, she merely asked why Mobley was chosen to temporarily fill Chiodo's position while Gray searched for a permanent replacement.  Taylor was aware of Chiodo's impending resignation prior to her

leave, and the application for the position the News Anchor/Reporter (morning) position was posted prior to Taylor's leave of absence. The application/posting was open during her leave, as well as during her return to work on April 4, 2022. Chiodo's vacant position was to be filled at Glover and Stewart's discretion.

A number of internal candidates, both men and women, approached Glover to be considered for Chiodo's job. These individuals included Mobley, Bill Hurrelbrink, and Cruz. Taylor never submitted an application to fill the position, nor did she tell Glover or Stewart, or others with authority at Gray, that she desired to apply for or audition for Chiodo's position. Ultimately, after many months of considering both internal and external candidates, Gray filled Chiodo's anchor spot with Cruz, a Latina female.

On April 4, 2022, Taylor came to work, worked about three hours, and handed Stewart her voluntary resignation. During Taylor's oral voluntary resignation conference, she raised generalized concerns to Stewart, for the first time, about a hostile/toxic work environment and that Glover had shared her personal medical information with several co-workers. Taylor had made no other complaints before April 4, 2022. In response to Taylor's generalized complaints, Stewart made a call later that day to Senior Human Resource Specialist, Laurel Berenguer, to report the claims Taylor made in connection with her resignation, particularly as it related to sharing Taylor's personal medical information. Berenguer talked to Glover, who denied ever discussing Taylor's medical condition with other employees. Stewart also talked with Glover and asked her if she had ever shared any personal medical information about Taylor. Glover responded that because she did not know what Taylor's medical condition was, she had no information to share.

Shortly after Taylor resigned, she sent an email to co-workers in which she stated that "this business is not easy to navigate as a single parent, but with a lot of your help, I was able to make it work for almost five years."

Taylor started her new job as a Communication Specialist with Johnson County on April 11, 2022. She accepted this job on March 17, 2022, which was well before she voluntarily resigned from KCTV5 on April 4, 2022.

Taylor worked at Johnson County as a Public Information Officer from April 2022 until April 2023. She made $65,000 annually and received benefits. On or around April 25, 2023, she started working for the City of Blue Springs and made $90,000 annually and received benefits. As of April 2023, Taylor made more money than she did at Gray, and any back pay damages (to which Gray denies Taylor is entitled) are cut off. The City of Blue Springs later terminated Taylor's employment. Taylor did two freelance projects and made $600 in total. In November and December 2023, Taylor worked for one month at Express Employment Services and made $20 an hour. In total, Taylor made $4,532.11 at Express Employment Services.

In the alternative, should back pay damages exist and not be cut off as of April 25, 2023, such damages should be cut off as of September 6, 2023, which as the end of her contractual term of employment with Gray. Taylor's September 2020 Employment Agreement provides as follows:

> **Term**. *Subject to the terms of this Agreement, Employer hereby employs Employee and Employee hereby accepts employment with Employer, beginning on* **September 7, 2020** *and ending on* **September 6, 2023** *as* **Newscaster** *(as further described in Exhibit A, the "Role"), subject to Paragraph 12 of this Agreement.*
>
> **3. Nature of Employment**
>
> *The parties hereby agree that Employee's employment with Employer is for the term specified above only, subject to Section 12, below, and that Employee shall have no expectation of continued employment beyond the term of employment specified herein.*

Because Taylor had no reasonable expectation of employment with Gray beyond September 6, 2023, any backpay/wage damages (to which Gray denies she is entitled) should be cut off as of that date.

On or around November 20, 2023, Taylor was offered employment at VML at the rate of $100,000 per year. Taylor began working at VML on or around January 9, 2024, receiving benefits and an annual salary of $100,000. Although Gray denies that Taylor is entitled to back pay/wage damages, if those damages are not cut off on April 23 or September 6, 2023, they should end as of November 20, 2023, at the latest. Gray will present expert-witness testimony further attacking any purported wage damages alleged.

On April 11, 2022, Stewart sent Taylor an email with a letter regarding her breach of contract by departing before the end of her term without notice and requesting $10,000 in Liquidated Damages. Paragraph 10(b) of Taylor's September 2020 Employment Contract provides as follows:

> With respect to any violation of Exhibit C, or any other breach of this Agreement, Employee agrees that, in addition to Employer's entitlement to obtain a restraining order or injunctive relief, he/she shall pay as liquidated damages to Employer the sum of **Ten Thousand ($10,000.00) Dollars**. Should Employee commit an actual breach of any covenants or provisions of Exhibit C, it is agreed that the term of any covenants of Exhibit C shall be automatically extended for a period of one (1) year from the date on which Employee permanently ceases such violation, or from the date of an entry by a court of competent jurisdiction of a final order or judgment enforcing such covenant, whichever is later. . ."

Taylor has not paid Gray the owed $10,000 in liquidated damages.

Paragraph 11 of the agreement further provides for the recovery of attorneys' fees:

> ***Attorneys' Fees and Costs***. *If Employee breaches any of the terms of this Agreement then Employee shall reimburse Employer for all costs and expenses, including reasonable attorneys' fees, incurred in enforcing the terms of this Agreement, without proof of any actual*

> *damages which may have been or may be caused by such breach,*
> *and without regard to the type of relief secured.*

Paragraph 22 of the September 2020 Agreement states that:

> *This Agreement shall be construed in accordance with the laws of*
> *the state where the Station is licensed by the Federal*
> *Communications Commission, or, if not employed by a Station, the*
> *state where Employee's office is located, applicable to Agreements*
> *to be performed entirely within that state.*

KCTV is licensed by the FCC in Missouri.

Taylor's breach of the September 2020 Employment Agreement has caused Gray to suffer liquidated damages in the amount of $10,000. Such damages are hard to calculate and represent an estimated amount of damages Gray incurs when an on-air news talent breaches an employment contract by departing before the term expires. Taylor voluntarily resigned her employment on April 4, 2022, without any notice, in breach of the September 2020 Employment Agreement setting out a term of employment through September 6, 2023. Gray suffered liquidated damages in the amount of $10,000, which estimates the amount of damages for not having on-air talent to fill designated roles, the cost associated with filling the role, training, and other estimated damages. In addition to liquidated damages in the amount of $10,000, Gray is entitled to recover attorneys fees and costs in this litigation in the approximate amount of $400,000-$600,000 pursuant to Paragraph 11 of Taylor's September 2020 Employment Agreement. Those fees and costs continue to accrue and will be updated at the dispositive-motion and trial stage, as well as any other stage as needed. Gray is also entitled to statutory interest at the rate of 9% pursuant to Mo. Rev. Stat. § 408.040.

Taylor is not entitled to any wage damages because she voluntarily resigned. Further, she has not incurred any damages because Gray's employment decisions about her (for example, being asked to report in the field and not being chosen as Chiodo's replacement) were based upon

legitimate factors other than race, gender, disability, or her FMLA request, and resulted in no adverse employment decision/action.  Taylor also is not entitled to any relief because she did not avail herself of Gray's complaint procedure regarding any purported acts of discrimination, retaliation, or other alleged wrongful acts.  And she is not entitled to an award of backpay because she resigned from her position.  She also is not entitled to any emotional distress damages, nor is she entitled to punitive damages because Gray's actions were not in willful violation of the law, malicious, or reckless.  Taylor is not entitled to liquidated damages under the FMLA because Gray acted in good faith and had reasonable grounds to believe its actions did not violate the FMLA. To the extent any backpay/wage damages are available to Taylor (which Gray denies), Gray will present expert-witness testimony concerning such purported damages.

## 4.    LEGAL CLAIMS AND DEFENSES.

### a.    Plaintiff Taylor's Claims.

Taylor asserts that she is entitled to recover upon the following theories: [2]

---

[2]    Taylor sought to expand the scope of the claims by also including in the Pretrial Order claims for race-based hostile work environment and constructive discharge (Count I), gender-based hostile work environment and constructive discharge (Count II), and FMLA constructive discharge (Count VI).  Gray objected on the grounds that there was no notice given of these claims as required by Fed. R. Civ. P. 8.  The court sustained the objection because Taylor's complaint did not give Gray fair notice that Taylor was asserting these claims.  Taylor requested inclusion of this footnote "to preserve a record of such for potential future amendments to this Order, other remedial action, or other justifiable action to be taken by this Court in preservation of justice."

Gray also objected to Taylor including in the Pretrial Order various allegations in support of the claims—specifically, that any failure to consider/promote is tied to race or gender discrimination; that the alleged acts of race and sex discrimination include treatment of vacation requests, changing Taylor's hours, and her demotion to full-time field reporter upon her return from leave; that the purported acts of disability discrimination include unnecessarily monitoring her actions while on leave, discussing her private medical information with coworkers, and attempting to unnecessarily change her schedule to exacerbate her sleep disorder; and that Taylor never pled any request for accommodation under the ADA and did not tie her allegations concerning discussing her private medical information, demoting her, and/or failing to return her to her previous position after taking a leave of absence to retaliation based on disability.  The court overrules these objections.  Taylor's complaint, when read as a whole, provides Gray with sufficient notice that Taylor is relying on the general trajectory of events recited therein to support

i. **Race Discrimination (Count I)** – Gray violated § 1981 and Title VII by discriminating against Taylor because of her race by failing to consider and/or promote her to the morning anchor position left vacant when Joe Chiodo left the station in the spring of 2022. Taylor also claims she was discriminated against based on her race in multiple instances, including Glover's treatment of vacation requests, the changing of her hours, and her demotion to full-time field reporter upon return from leave.

ii. **Sex Discrimination (Count II)** – Gray violated Title VII by discriminating against Taylor based on her sex (female) by failing to consider and/or promote her to the morning anchor position left vacant when Joe Chiodo left the station in the spring of 2022. Taylor also claims she was discriminated against based on her gender in multiple instances, including Glover's treatment of vacation requests, changing of her hours, and her demotion to full-time field reporter upon return from leave.

iii. **Disability Discrimination (Count III)** – Gray violated the ADA by discriminating against Taylor because of her disability by unnecessarily monitoring her actions while on leave, discussing her private medical information with coworkers, and attempting to unnecessarily change her schedule to exacerbate her sleep disorder symptoms.

iv. **Retaliation Based on Disability (Count IV)** – Gray violated the ADA by retaliating against Taylor in the terms and conditions of her employment in response to her exercising her right to request accommodation and/or leave protected by the ADA by discussing her private medical information with coworkers and demoting her and/or failing to return her to her previous return her to her previous position after taking a recognized leave of absence.

v. **Violation of the Family Medical Leave Act (Count VI)** – Gray violated the FMLA by failing to return Taylor to the same or similar position after her applied-for leave.

b. **Defendant's Defenses**.

Gray asserts the following defenses, in addition to arguing that Taylor cannot establish the

*prima facie* elements of each of her claims:

---

the claims she asserts. Although the complaint may not be a model of clarity as to which specific events she alleges correlate with each specific claim, such precision is not required at the initial pleading stage. The overall gist of the allegations in Taylor's complaint was sufficient to put Gray on notice of the need to conduct discovery to explore the precise contours of the various claims.

**Race/Sex Discrimination Under Title VII (Counts I and II) and Race Discrimination under Section 1981 (Count I)**

i.    These claims are barred to the extent Taylor's allegations were not encompassed in her charge of discrimination with the Equal Employment Opportunity Commission ("EEOC")—for example, failure to promote; and failure to consider and/or promote based on race.

ii.    These claims are barred because Gray's actions were based on legitimate, non-discriminatory business reasons unrelated to any protected status based upon race or sex.

iii.    These claims are barred because Taylor was not subject to any actionable adverse employment action(s) by Gray.

iv.    Gray would have taken the same action concerning Taylor, regardless of any impermissible motive (which Gray denies).

v.    Gray acted in good faith and with reasonable grounds to believe its conduct was in full compliance with all relevant laws.

vi.    Any action Gray took with respect to Taylor was within its business judgment.

vii.    Any alleged adverse employment action was justified by legitimate, non-discriminatory reasons unrelated to Taylor's race or gender.

viii.    Gray took reasonable steps to prevent and correct workplace discrimination in that Gray has in place a clear, effective, and well-disseminated policy against discrimination and a reasonable and available procedure for handling complaints that provides for prompt and effective responsive action.

ix.    Taylor unreasonably failed to use the preventive and corrective measures that Gray provided; and reasonable use of Gray's procedures would have prevented at least some of the harm that Taylor allegedly suffered.

x.    Taylor is not entitled to any back pay or related damages for these claims as of April 4, 2022, because she chose to voluntarily leave by resigning.

xi.    These claims are barred by the doctrine of after-acquired evidence because Taylor breached her employment contract by accepting a job with Johnson County on March 17, 2022, while she was still employed by Gray and her employment contract was not set to expire until September 6, 2023, thus warranting termination of her employment.

xii.    Taylor cannot recover punitive damages because Gray's alleged actions were not intentional, malicious, willful or reckless.

xiii.    Gray is not liable for punitive damages because (a) it at all times made a good-faith effort to comply with the law and any action by a manager contrary to this effort violates Gray's policies and procedures, (b) such damages would violate the due process, equal protection, and cruel and unusual punishment provisions of the United States Constitution; and (c) the standard by which Gray is to be evaluated for determining the amount of punitive damages is so vague and overly arbitrary that it supplies no notice of potential repercussions of the alleged misconduct, thereby denying Gray due process under the Fifth and Fourteenth Amendments to the United States Constitution, as well as under the Kansas Constitution.

xiv.    As to Taylor's claims for § 1981 Race Discrimination under Count I, Taylor's race was not the but-for cause of any alleged adverse action (which Gray specifically denies occurred).

### Disability Discrimination under the ADA (Count III)

i.    Count III is barred to the extent that Taylor's allegations were not encompassed in her EEOC charge of discrimination—for example, unnecessarily monitoring her actions while on leave; attempting to change her schedule to exacerbate her sleep disorder symptoms; and discussing her private medical information with co-workers.

ii.    Gray's actions were based on legitimate, non-discriminatory business reasons unrelated to any protected status based upon disability.

iii.    Taylor is not a "qualified individual with a disability" as defined in 42 U.S.C. § 12111(8).

iv.    Taylor's alleged disability was not known to the decisionmakers relevant to any alleged adverse action.

v.    Taylor never notified Gray of the need of any reasonable accommodation based upon her alleged disability.

vi.    Gray's actions were based on legitimate, non-discriminatory business reasons unrelated to any protected status based upon any alleged disability.

vii.    Taylor did not suffer any actionable adverse employment action.

viii.    Gray would have taken the same action concerning Taylor, regardless of any protected status or impermissible motive (which Gray denies).

ix.    Any action Gray took with respect to Taylor was within its business judgment.

x.    Even if Taylor's alleged disability was a factor in any employment decision (which Gray denies), Gray would have taken the same actions anyway for

a legitimate, non-discriminatory reason or good cause entirely unrelated to Taylor's alleged disability.

xi.     Gray took reasonable steps to prevent and correct workplace discrimination in that Gray has in place a clear, effective, and well-disseminated policy against discrimination and a reasonable and available procedure for handling complaints thereof that provides for prompt and effective responsive action.

xii.    Taylor unreasonably failed to use the preventive and corrective measures that Gray provided; and reasonable use of Gray's procedures would have prevented at least some of the harm that Taylor allegedly suffered.

xiii.   Count III is barred by the doctrine of after-acquired evidence because Taylor breached her employment contract by accepting a job with Johnson County on March 17, 2022, while still employed by Gray and her employment contract that was not set to expire until September 6, 2023, thus warranting termination of her employment.

xiv.    Taylor cannot recover punitive damages because Gray's alleged actions were not intentional, malicious, willful or reckless.

xv.     Gray is not liable for punitive damages because (a) it at all times made a good-faith effort to comply with the law and any action by a manager contrary to this effort is in violation of Gray's policies and procedures; (b) such damages would violate the due process, equal protection, and cruel and unusual punishment provisions of the United States Constitution; and (c) the standard by which Gray is to be evaluated for determining the amount of punitive damages is so vague and overly arbitrary that it supplies no notice of potential repercussions of the alleged misconduct, thereby denying Gray due process under the Fifth and Fourteenth Amendments to the United States Constitution, as well as under the Kansas Constitution.

### Retaliation Claim Under the ADA (Count IV)

i.      This claim is barred to the extent Taylor's allegations were not encompassed in her EEOC charge of discrimination—for example, discussing her private medical information with co-workers; and retaliation based on any request for accommodation under the ADA.

ii.     Gray's actions were based on legitimate, non-discriminatory business reasons unrelated to any protected activity related to any alleged disability discrimination.

iii.    Taylor failed to engage in any protected activity under 42 U.S.C. § 12203 et seq., in that she made no requests for accommodation under the ADA based upon disability and made no complaints during her employment at Gray. She only made complaints after she submitted her resignation.

iv.    Gray did not subject to Taylor to any actionable adverse employment actions.

v.    To the extent Taylor engaged in any alleged protected activity and such activity was an improper factor in any employment decision (which Gray denies), Gray would have made the same decision for legitimate, non-discriminatory reasons.

vi.    Taylor's alleged protected activity was not the but-for cause of any employment decision made by Gray.

vii.    Any action Gray took with respect to Taylor was within its business judgment.

viii.    Gray's actions were based on legitimate, non-discriminatory and non-retaliatory business purposes, or business necessity unrelated to any purported protected conduct or protected status.

ix.    Taylor cannot recover punitive damages because Gray's alleged actions were not intentional, malicious, willful, or reckless.

x.    Gray is not liable for punitive damages because (a) it at all times made a good-faith effort to comply with the law and any action by a manager contrary to this effort is in violation of Gray's policies and procedures; (b) such damages would violate the due process, equal protection, and cruel and unusual punishment provisions of the United States Constitution; and (c) the standard by which Gray is to be evaluated for determining the amount of punitive damages is so vague and overly arbitrary that it supplies no notice of potential repercussions of the alleged misconduct, thereby denying Gray due process under the Fifth and Fourteenth Amendments to the United States Constitution, as well as under the Kansas Constitution.

**Violation of the FMLA (Count VI)**

i.    Taylor's leave was not protected by the FMLA because she did not timely submit required paperwork.

ii.    Taylor did not comply with her FMLA obligations in that she did not timely submit the proper medical documentation and, when she did submit purported medical documentation (which Gray denies was proper medical documentation to certify FMLA leave), she already had resigned her employment from Gray.

iii.    Taylor had no reasonable intent to return to work from her leave.

iv.    Taylor did not meaningfully return to work from her leave.

    **v.**      Taylor was not denied any leave and received all the leave she requested, despite not having FMLA approved/protected leave.

    **vi.**      To the extent Taylor was eligible for FMLA protections (which Gray denies), she was restored to the same position she had prior to her leave or to a position with equivalent employment benefits, pay, and other terms and conditions of employment.

    **vii.**    Gray's alleged actionable adverse employment actions were based on legitimate, non-discriminatory, and non-retaliatory reasons entirely unrelated to Taylor's purported exercise of FMLA rights.

    **viii.**   Gray's employment decisions regarding Taylor were based on legitimate, non-discriminatory, non-retaliatory reasons and were consistent with business necessity.

    **ix.**      Taylor cannot recover emotional distress damages under the FMLA as such damages are not recoverable under the FMLA.

    **x.**      Taylor is not entitled to liquidated damages under 29 U.S.C. § 2617(a)(1)(A)(iii) because Gray acted at all relevant times in good faith and with reasonable grounds to believe its act or omissions were consistent with the FMLA.

**c.**    **Defendant Gray's Counterclaim**

Gray asserts that it is entitled to recover upon the following theory:

    **i.**      **<u>Breach of Contract</u>** – Taylor breached Paragraph 10 of the September 2020 Employment Agreement when she voluntarily resigned from her position as Newscaster without notice on April 4, 2022, when the agreement's term was not set to expire until September 6, 2023. Gray is therefore entitled to liquidated damages and attorneys' fees and costs pursuant to the September 2020 Employment Agreement, as well as statutory interest.

**d.**    **Taylor's Defenses to Counterclaim**

    **i.**      The counterclaim is barred because Taylor's actions were made in good faith and with reasonable grounds to believe her conduct was in full compliance with the relevant laws.

    **ii.**      Gray has misplead the alleged damages because recovery of less than the requested amount would satisfy the alleged contractual damages. Therefore, damages must be reduced to the extent the alleged damages are in excess of the amount that would satisfy the alleged breach of contract.

    **iii.**    Gray did not suffer any damages as a result of any alleged breach.

iv.    Some or all of Gray's alleged damages are the result of Gray's own actions and not a result of any action by Taylor.

v.     Taylor did not cause any alleged damage and/or such damages are attributable to some other source, including Gray's treatment of Taylor that constituted an alleged breach of law.

vi.    There was no valid and/or enforceable contract for Taylor to have allegedly breached.  Gray breached the contract by violating § 1981, Title VII, the FMLA, the ADA, common law, and the agreed-upon terms of the CBA and Agreement (all related to hiring practices related to the morning anchor position vacated by Chiodo, as well as the alleged breach of FMLA upon Taylor's attempted return to work)—all prior to Taylor's alleged breach. She therefore had no remaining obligation to perform.

vii.   The alleged contract was unconscionable and is therefore unenforceable.

## 5.    DAMAGES AND NON-MONETARY RELIEF REQUESTED.

### Damages on Plaintiff's Claims

a.    Plaintiff Taylor seeks the following damages and non-monetary relief:

i.    For Taylor's race discrimination claims under 42 U.S.C. § 1981, she seeks:

a.    Damages between $750,000 and $1,000,000 as authorized by 42 U.S.C. § 1981.  These damages include non-economic and compensatory damages to be determined by the finder of fact, and economic damages in a number to be testified to by Taylor's expert currently totaling $108,421.00, and subject to any amended expert report properly disclosed by Taylor.

b.    Punitive damages as authorized by 42 U.S.C. § 1981.

c.    Attorneys' fees in accordance with 42 U.S.C. § 1988(b) should Taylor be the prevailing party.

d.    Expert fees in accordance with 42 U.S.C. § 1988(c).

ii.   For Taylor's sex and race discrimination claims under 42 U.S.C. § 2000e *et seq.*, she seeks:

a.  Compensatory damages in excess of $300,000[3], including non-economic damages and other compensatory damages to be determined by the finder of fact, and as authorized by 42 U.S.C. § 1981a(a)(1).

b.  Economic damages for lost wages in a number to be testified to by Taylor's expert currently totaling $108,421.00 and subject to any amended expert report properly submitted and disclosed by Taylor as authorized by 42 U.S.C. § 1981.

c.  Punitive damages in excess of $300,000[4] as authorized by 42 U.S.C. § 1981a(a)(1).

d.  Attorneys' fees in accordance with 42 U.S.C. § 2000e-5(k).

iii.  For Taylor's disability discrimination claims under 42 U.S.C. § 12101 *et seq.*, she seeks:

a.  Compensatory damages in excess of $300,000[5], including non-economic damages and other compensatory damages to be determined by the finder of fact, and as authorized by 42 U.S.C. § 1981a(a)(1).

b.  Economic damages for lost wages in a number to be testified to by Taylor's expert currently totaling $108,421.00 and subject to any amended expert report properly submitted and disclosed by Taylor as authorized by 42 U.S.C. § 1981.

c.  Punitive damages in excess of $300,000[6] as authorized by 42 U.S.C. § 1981a(a)(2).

d.  Attorneys' fees in accordance with 42 U.S.C. § 12205.

iv.  For Taylor's FMLA claims under 29 U.S.C. § 2501 *et seq.*, she seeks:

a.  Economic damages in a number to be testified to by Taylor's expert currently totaling $108,421.00 and subject to any amended expert report properly disclosed by Taylor as authorized by 29 U.S.C. § 2617(a)(1)(A)(i)(I).

b.  Interest on the damages claimed in subsection (iv)(a) above as authorized by 29 U.S.C. § 2617(a)(1)(A)(ii).

---

[3]  The parties agree that any final judgment on these claims are subject to the $300,000 cap in 42 U.S.C. § 1981a(b)(3).

[4]  Same statutory damage cap as in footnote 3, *supra*.

[5]  Same statutory damage cap as in footnote 3, *supra*.

[6]  Same statutory damage cap as in footnote 3, *supra*.

      c.   Liquidated damages equal to the sum of damages claimed in subsections (iv)(a) and (b) above, as Gray did not act in good faith in violating the FMLA, as authorized by 29 U.S.C. § 2617(a)(1)(A)(iii).

      d.   Attorneys' fees, expert witness fees, and other costs as authorized by 29 U.S.C. § 2617(a)(3).

**b.**     To the extent that Gray prevails on Taylor's claims, Gray seeks the following:

      i.   As to Taylor's Title VII claims, attorneys' fees and costs.  *See* 42 U.S.C. § 2000e-5(k); Fed. R. Civ. P. 54(d).

      ii.   As to Taylor's ADA disability claim, attorneys' fees and costs.  *See* 42 U.S.C. § 12205; Fed. R. Civ. P. 54(d).

      iii.   As to Taylor's § 1981 race discrimination claim, attorneys' fees and costs. *See* 42 U.S.C. § 1988(b); Fed. R. Civ. P. 54(d).

      iv.   As to Taylor's FMLA claim, attorneys' fees and costs.  *See* Fed. R. Civ. P. 54(d).

### <u>Damages on Defendant's Counterclaim</u>

a.     Defendant Gray seeks the following damages and non-monetary relief for its breach-of-contract counterclaim:

      i.   $10,000 in liquidated damages in accordance with the September 2020 Employment Agreement.

      ii.   Costs and expenses, including attorneys' fees, which will be in the $400,000-$600,000 range, in accordance with the September 2020 Employment Agreement.

      iii.   Pre- and post-judgment interest at the statutory interest rate of 9%.  *See* Mo. Rev. Stat. § 408.040.

b.     To the extent Taylor prevails on Gray's counterclaim, she seeks the following:

      i.   Attorney's fees and costs as a prevailing party in accordance with the September 2020 Employment Agreement.[7]

---

[7] Gray denies that Taylor is entitled to attorneys' fees or other relief on Gray's counterclaim because, even if Taylor prevails on that counterclaim, the attorneys' fee provision in the September 2020 Employment Agreement is a one-way provision that only allows Gray to recover its attorneys' fees.

6.    **AMENDMENTS TO PLEADINGS.**

None.

7.    **DISCOVERY.**

Under the scheduling order and any amendments, all discovery was to have been completed by June 29, 2024.  Discovery is complete aside from a pending dispute regarding the production of documents related to the email produced at GRAY TAYLOR 002869.  The court discussed this dispute with the parties during the reconvened pretrial conference on October 4, 2024, and, by separate order, set a briefing schedule for a motion to compel on this issue.

Unopposed discovery may continue after the deadline to complete discovery so long as it does not delay briefing or ruling on dispositive motions or other pretrial preparations.  Although discovery may be conducted beyond the deadline to complete discovery if all parties agree to do so, under these circumstances the court will not be available to resolve any disputes that arise during the course of such extended discovery.

8.    **MOTIONS.**

a.    **Pending Motions.**

None.

b.    **Additional Pretrial Motions.**

After the pretrial conference, the parties intend to file summary judgment motions and motions *in limine*.

The dispositive-motion deadline is set for **November 15, 2024**.  The parties should follow the summary-judgment guidelines on the court's website:

*http://ksd.uscourts.gov/wp-content/uploads/2015/10/Summary-Judgment-Guidelines.pdf*

Principal briefs in support of, or in response to, summary judgment motions must not exceed 40 pages and replies must not exceed 15 pages.  *See* D. KAN. RULE 7.1(d)(2).  Any motion

to exceed these page limits or for an extension of briefing deadlines must be filed at least three days before the brief's filing deadline.  *See* D. KAN. RULE 6.1(a), 7.1(d)(4).

### c.    Motions Regarding Expert Testimony.

The parties have stipulated that no motions will be filed challenging the propriety of expert testimony in this case.

## 9.    TRIAL.

This case is set for a bench trial on **June 23, 2025, at 9:00 a.m.** in Kansas City, Kansas. The estimated trial time is 4 days.

The court will attempt to decide any timely filed dispositive motions approximately 60 days before trial.  If no dispositive motions are timely filed, or if the case remains at issue after timely dispositive motions have been decided, then the trial judge may enter an order or convene another pretrial conference to set deadlines for filing final witness and exhibit disclosures, exchanging and marking trial exhibits, designating deposition testimony for presentation at trial, motions in limine, proposed instructions in jury trials, and proposed findings of fact and conclusions of law in bench trials.

## 10.    ALTERNATIVE DISPUTE RESOLUTION (ADR).

There are no active settlement discussions.  The parties currently believe the prospects for settlement of this case are poor due the disparity in the original demand and Gray's counter-offer. After consultation with the parties, the court orders the parties to participate in mediation by **May 9, 2025**.  The parties must jointly file a mediation notice no later than **March 10, 2025**, stating the firmly scheduled date, time, and place of the mediation, as well as the name of the mediator.

The parties are reminded that, under D. Kan. Rule 40.3, they must immediately notify the court if they reach an agreement that resolves the litigation as to any or all parties.  Jury costs may

be assessed under this rule if the parties do not provide notice of settlement to the court's jury coordinator at least one full business day before the scheduled trial date.

IT IS SO ORDERED.

Dated October 4, 2024, at Kansas City, Kansas.


_____ s/ Angel D. Mitchell _____
Angel D. Mitchell
U. S. Magistrate Judge